UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SCOTT KRUMHOLZ, et al.,            *
                                    *
        Plaintiffs,                 *
                                    *
v.                                  *    Civil Action No. 08-12137-JLT
                                    *
AJA, LLC, et al.,                   *
                                    *
        Defendants.                 *

MEMORANDUM

January 13, 2010

TAURO, J.

I.   Introduction

This action arises out of a contract between Plaintiffs and Defendants, by which Plaintiffs became the owners of an Emack & Bolio's ice cream franchise store. Presently at issue is Defendants' Motion for Summary Judgment [#22]. Because the governing agreement contains a contractual limitations clause that bars Plaintiffs' claims, Defendants' Motion for Summary Judgment [#22] is ALLOWED.

II.  Background[1]

Emack and Bolio's ("E & B") is an ice cream shop franchise, owned in large part by Defendant Robert Rook. On December 14, 2002, Plaintiffs attended a meeting with Defendant Rook, owner of E & B and managing member of Defendant AJA, at an E & B store in New York

---

[1] This court presents these facts in the light most favorable to Plaintiff, the party that does not prevail on summary judgment. See Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005) ("[L]ike the district court, we must scrutinize the record in the light most favorable to the summary judgment loser and draw all reasonable inferences therefrom to that party's behoof.").

to discuss their interest in owning and operating an E & B franchise.[2] At the meeting, Rook made several material misrepresentations and omissions, which Plaintiffs relied upon in agreeing to establish an E & B franchise, including: 1) severely understated start-up and operational costs; 2) artificially inflated sales projections; 3) false promises of business autonomy; and 4) unlawful earnings claims.[3] Specifically, Defendant Rook made the following representations regarding the operation of an E & B franchise, none of which were accurate:

> "a. The average costs of the initial build-out of the store would range between $75,000 to $125,000;
> b. Initial inventory would cost $10,000;
> c. Equipment for the store would cost between $40,000 and $50,000;
> d. Plaintiffs would realize profits of between 30% and 40% of the gross receipts;
> e. A store with a $4,600 monthly rent would require revenues of between $400 and $425 per day to operate profitably;
> f. Throughout the system, store employees were paid a wage of eight dollars ($8.00) per hour.
> g. The cost of shipping ice cream was two dollars ($2.00) per tub;
> h. Food and supply costs would comprise twenty eight percent (28%) of total gross, broken down as twenty five percent (25%) of gross for food costs and an additional three percent (3%) of gross for the cost of paper goods; and
> i. The New York Herald Square E & B store has generated $3,000 in daily revenues."[4]

Based on these representations, Plaintiffs Scott and Lawra Krumholz entered into the "Master Distribution Agreement", which established a franchise relationship between Plaintiffs and Defendants.[5] Plaintiffs created E & B Commerce Center, Inc. ("CCI") and became its two shareholders for the purpose of owning and operating their E & B franchise.[6] In February 2003,

---

[2]Compl. ¶ 20.

[3]Id. at ¶ 3.

[4]Id. at ¶ 21.

[5]Id. at ¶¶ 23, 59-64.

[6]Id. at ¶ 11.

Plaintiffs began constructing their E & B store in North Brunswick, New Jersey, and opened for business in May 2003.[7]

Shortly thereafter, Plaintiffs discovered that the requisite costs for start-up, equipment, and initial inventory far exceeded the amounts quoted to them by Defendant Rook in the New York Meeting.[8] Similarly, the weekly sales revenue generated by Plaintiffs' store fell far short of Defendant Rook's estimates.[9] In addition, Defendant Rook had failed to disclose to Plaintiffs that they would only receive the $2.00 per tub delivery rate for ice cream if they placed product orders exceeding $5,000.[10] This limitation forced Plaintiffs to choose between unaffordable delivery costs and ordering more ice cream at a time than they could feasibly store, thereby leading to spoilage problems.[11]

Defendant Rook also misled Plaintiffs as to the degree of autonomy they would have in running their business and imposed extensive restrictions on their operations that ultimately hindered the store's profitability.[12] While Defendants market and sell the concept as a distributorship, they exercised a level of control over Plaintiffs' business that in fact brings the relationship established by the Master Distribution Agreement within the legal definition of a

---

[7] Id. at ¶¶ 27, 32.

[8] Id. at ¶¶ 29-31.

[9] Id. at ¶¶ 33-36.

[10] Id. at ¶ 52

[11] Id. at ¶¶ 52-55.

[12] Id. at ¶¶ 59-64.

franchise.[13]

By the end of 2004, Plaintiffs' first full year of operation, it was clear that the store's actual earnings were drastically lower than the projections provided by Defendant Rook.[14] In fact, during the entire period of time that Plaintiff's operated their E & B store, their weekly sales never even approached the levels that Defendant Rook had estimated.[15] In order to keep their store afloat despite crippling losses, Plaintiffs injected significant sums of their personal funds into the business by borrowing from family members and against other business interests that they owned.[16] Notwithstanding Plaintiffs' below market rent, minimal debt service, and increased marketing efforts, the losses continued to mount rapidly.[17] In or about December 2006 Plaintiffs closed their E & B franchise, having sustained total losses of approximately $800,000.[18]

In 2008, Jeff Pullman, another failed E & B franchise operator, contacted Plaintiffs to explain that he had encountered similar problems with Defendant Rook and that his franchise store had also gone out of business due to financial strain.[19] Mr. Pullman stated that he, along with a group of other E & B franchise owners, had met with Attorney David Paris to discuss pursuing legal action against the company.[20] Thereafter, Plaintiffs contacted Attorney Paris, who

---

[13] Id. at ¶ 7.

[14] Id. at ¶ 34.

[15] Id. at ¶ 35.

[16] Id. at ¶ 40.

[17] Id. at ¶ 43.

[18] Id. at ¶¶ 44-45.

[19] Scott Krumholz Aff. Supp. Pl.'s Mem. Opp. Def.'s Mot. Sum. Judg., ¶ 28.

[20] Id. at ¶¶ 29-30.

told them that the Master Distribution Agreement gave rise to a franchise relationship and that, by law, Defendants were obligated to provide Plaintiffs with a formal disclosure document before they decided to purchase the franchise.[21] Plaintiffs now claim that they would not have invested in an E & B franchise, had they received this formal disclosure document prior to signing the Master Distribution Agreement.[22]

Plaintiffs' complaint brings the following claims: Count I, Fraudulent Inducement; Count II, Breach of the Implied Covenant of Good Faith and Fair Dealing; Count III, Negligent Misrepresentation; Count IV, Intentional Misrepresentation; and Count V, Unfair and Deceptive Trade Practices in Violation of M.G.L. c. 93A.

II.    Discussion

Defendants move this court for an order of summary judgment in their favor on the grounds that all claims asserted by Plaintiffs are time-barred by the Master Distribution Agreement's contractual limitations clause, which states in relevant part:

> "Any and all claims...arising from or relating to this agreement or the relationship among the parties shall be barred unless an action or legal proceeding is commenced within one (1) year from the date the claimant knew or should have known of the facts giving rise to such claims."[23]

A.    Summary Judgment

Pursuant to Fed. Rule of Civ. Pro. 56(a), summary judgment shall be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter

---

[21] Id. at ¶¶ 30-34.

[22] Id. at ¶ 35; Compl. ¶ 69.

[23] Def.'s Mot. Sum. Judg. Ex. A, Master Distribution Agreement, ¶13(f) (original in uppercase letters) [hereinafter "Master Distribution Agreement"].

of law.[24]  In granting a summary judgment motion, the court "must scrutinize the record in the light most favorable to the summary judgment loser and draw all reasonable inferences therefrom to that party's behoof."[25]  The parties here do not dispute the material facts relevant to the issue of whether the contractual limitations period bars Plaintiffs' claims and, therefore, disposition of the issue as a matter of law is appropriate.

      B.      <u>Validity of the Agreement</u>

The parties do not dispute that the Master Distribution Agreement as a whole is a valid and enforceable contract.  Though Plaintiffs obliquely refer to the Master Distribution Agreement as a contract of adhesion[26] in their opposition to Defendants' Motion for Summary Judgment, they do not seriously challenge the validity of the contract as written.  In fact, Plaintiffs' complaint refers to the Master Distribution Agreement as the "governing" agreement.[27]  The inference that Plaintiffs understood and voluntarily agreed to the contract at issue seems entirely reasonable when viewed in light of the fact that Plaintiff Lawra Dodge Krumholz already owns one small business and Plaintiff Scott Krumholz is an experienced attorney.  As such, this court does not doubt that Plaintiffs entered into the Master Distribution Agreement freely.  Having done so, Plaintiffs are bound by the contractual language to which they agreed.

More particularly, the parties do not challenge the validity of the contractual limitations clause.  Massachusetts law allows parties to contract for limitations periods shorter than the

---

[24]<u>Prescott v. Higgins</u>, 538 F.3d 32, 40 (1st Cir. 2008).

[25]<u>Alliance of Auto. Mfrs. v. Gwadosky</u>, 430 F.3d 30, 34 (1st Cir. 2005).

[26]<u>See</u> Pl.'s Mem. Opp. Def.'s Mot. Sum. Judg., 12.

[27]<u>See</u> Compl. ¶ 18.

limitations period provided by law, as long as the agreed upon period is reasonable.[28]  Notably, in considering the issue of what may constitute a reasonable limitations period, courts applying Massachusetts law have determined periods ranging from ninety days to thirty-nine months to be reasonable.[29]  Indeed, the First Circuit found a contract clause that similarly barred claims brought more than one year after the plaintiff knew or should have known of the facts giving rise to the cause of action to be reasonable and enforceable under Massachusetts law, despite the brevity of the limitations period.[30]  Accordingly, this court finds the contractual limitations clause to be valid and binding on the parties to the agreement.

        C.       <u>Interpretation of the Limitations Clause</u>

Without presenting an argument as to why the contractual limitations period should not apply to the claims set forth in the complaint, Plaintiff asserts that the court should apply the three year statute of limitations provided by law to Plaintiffs' tort claims and the four year statute of limitations provided by law to Plaintiffs' claim under M.G.L. c. 93A.  Defendant, however, contends that the language of the limitations clause is broad enough to encompass all of Plaintiffs' claims, including the statutory claim brought pursuant to M.G.L. c. 93A.  This court agrees with Defendant.

The interpretation of unambiguous contract language is a question of law for the court to decide, as is the preliminary question of whether contract language in fact contains ambiguities in

---

[28] <u>Alcorn v. Raytheon</u>, 175 F.Supp.2d 117, 121 (D. Mass. 2001) (citing <u>Doe v. Blue Cross & Blue Shield of Wisc.</u>, 112 F.3d 869, 874 (7th Cir. 1997)).

[29] <u>Id.</u>

[30] <u>Hays v. Mobil Oil Corp.</u>, 930 F.2d 96, 100 (1st Cir. 1991).

the first instance.[31]  Contract language is sufficiently ambiguous to prevent the court from interpreting it as a matter of law only when "the phraseology can support reasonable differences of opinion as to the meaning of the words employed."[32]

The Master Distribution Agreement's limitations clause does not appear ambiguous on its face and, importantly, Plaintiffs do not argue that the language of the clause can support conflicting interpretations. This court, therefore, must construe the language of the limitations clause  in its usual and ordinary sense and enforce it according to its terms.[33]

By its terms, the contractual limitations clause applies to "[a]ny and all claims, except claims for monies due us or our affiliates, arising from or relating to this agreement or the relationship among the parties...."[34] In Hays v. Mobil Oil Corporation, the First Circuit applied Massachusetts principles of contract interpretation to a similarly broad limitations clause and found the clause to be sufficiently broad to encompass both tort claims and a claim arising under M.G.L. c. 93A.[35]  Though the language of the clause at issue in Hays is not identical to that at issue here, this court finds it equally reasonable to interpret the limitations clause in this case to encompass all of the claims set forth in Plaintiffs' complaint.  To find otherwise would require the

---

[31]Eigerman v. Putnam Invs., Inc., 450 Mass. 281, 287 (2007).

[32]Coll v. PB Diagnostic Systems, Inc., 50 F.3d 1115, 1122 (1st Cir. 1995).

[33]116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992).

[34]Master Distribution Agreement ¶ 13(f).

[35]930 F.2d at 100.  The limitations clause at issue in Hays provided that "any claim of any kind...based on or arising out of this contract or otherwise shall be barred unless asserted...within 12 months after the delivery of the products or other event, action or inaction to which the claim relates."

court to torture the otherwise plain and clear contract language at issue.

      D.      <u>Application of the One-Year Limitations Period to Plaintiffs' Claims</u>

In light of the conclusion that the contractual limitations period applies to all of Plaintiffs' claims, Defendants are entitled to summary judgment if Plaintiffs' claims accrued, as a matter of law, more than one year prior to the filing of the complaint.

          1.      <u>Accrual of the Claims Under the Discovery Rule</u>

Generally, the limitations period begins to run when the plaintiff suffers an injury.[36] The contractual limitations clause, however, specifies that the limitations period begins to run only when the plaintiff knows or should have known of the facts giving rise to the claims. This is also known as the "discovery rule" and has been recognized by Massachusetts courts to toll the limitations period in actions based on an alleged misrepresentation that concerns a fact inherently unknowable to the injured party, such as in M.G.L. c. 93A actions.[37]

Under the discovery rule, "a cause of action...does not accrue until the plaintiff knew, or in the exercise of reasonable diligence should have known of the factual basis for his cause of action."[38] The plaintiff need not know every fact required to prevail on the claim.[39] Instead, the limitations period is triggered when the plaintiff has enough information to suggest that he has

---

[36] <u>Taygeta Corp. V. Varian Assocs., Inc.</u>, 436 Mass. 217, 229 (2002).

[37] <u>See id.</u>; <u>Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.</u>, 29 Mass. App. Ct. 215, 221 (1990).

[38] <u>Wolinetz v. Berkshire Life Ins. Co.</u>, 361 F.3d 44, 47-48 (1st Cir. 2004) (internal quotation omitted).

[39] <u>Riley v. Presnell</u>, 409 Mass. 239, 243 (1991).

suffered an injury caused by the defendant's conduct.[40] The court must ask whether sufficient facts were available to provoke a reasonable person in the plaintiff's circumstances to inquire or investigate further.[41] If so, the plaintiff is charged with the knowledge of "what he or she would have uncovered through a reasonably diligent investigation."[42]

In other words, summary judgment may issue in this action if there are no genuine issues of material fact as to whether Plaintiffs had "(1) knowledge or sufficient notice that [they were] harmed and (2) knowledge or sufficient notice of what the cause of harm was,"[43] prior to December 24, 2007, one year before they filed the complaint. Notably, the question of whether Plaintiffs had notice of the legal basis for their claims is irrelevant to the limitations analysis.[44] The limitations period is triggered when a plaintiff has sufficient notice of the *facts* giving rise to the claim.[45]

    2.    <u>Analysis</u>

The five claims set forth in Plaintiffs' complaint all stem from the same alleged misconduct on the part of Defendants. Plaintiffs allege that Defendants fraudulently induced Plaintiffs to invest significant financial resources in an E & B franchise through material misrepresentations

---

[40] Wolinetz, 361 F.3d at 48 (citing Int'l Mobiles Corp., 29 Mass. App. Ct. at 218).

[41] McIntyre v. United States, 367 F.3d 38, 52 (1st Cir. 2004) (internal citation omitted).

[42] Id. (internal citation omitted).

[43] Ross v. Garabedian, 433 Mass. 360, 363 (2001).

[44] See Riley, 409 Mass. at 243 (quoting Bowen v. Eli Lilly & Co., 408 Mass. 204, 208 (1990)) ("'We do not require that a plaintiff have notice of a breach of duty before a cause of action may accrue....'").

[45] Id.

and omissions. Specifically, Plaintiffs claim that, in pitching the E & B franchise, Defendants (1) understated start-up and operational costs, (2) artificially inflated sales projections, and (3) made unlawful earnings claims. Because Defendants' representations never materialized, Plaintiffs sustained substantial financial losses. Plaintiffs submit that, if not for Defendants' misrepresentations, they would never have purchased the right to operate an E & B franchise.

The alleged misrepresentations and omissions at issue occurred during a meeting between Plaintiffs and Defendants on December 14, 2002.[46] Plaintiffs' E & B store opened for business in May 2003.[47] By the end of 2004, the first full year of operation, it was clear to Plaintiffs that the costs of construction, equipment, and inventory were drastically higher than the amount quoted to them by Defendants and that their earnings since opening had fallen "woefully short of the earnings projections" provided by Defendants.[48]

Plaintiffs managed to keep their store afloat, notwithstanding the rapidly mounting losses, by injecting large sums of personal funds into the business, which they borrowed from family members and their other business interests.[49] "Still, the losses continued to mount despite Plaintiffs' below market rent, minimal debt service, and increased marketing and advertising efforts" and Plaintiffs closed the franchise store in or about December 2006.[50]

In light of the foregoing facts, one cannot reasonably contend that, at least by December

---

[46]Compl. ¶¶ 20-26.

[47]Id. at ¶ 32.

[48]Id. at ¶¶ 29-34.

[49]Id. at ¶ 40.

[50]Id. at ¶¶ 43-44.

2006 after closing the store due to crippling losses, Plaintiffs did not have notice of the harm caused them, i.e. $800,000 in losses, as well as the cause of the harm, i.e. Defendants' gross misrepresentations related to the operation of an E & B store, which induced Plaintiffs to purchase the franchise in the first place.

Certainly the exercise of reasonable diligence at least required Plaintiffs to inquire into the basis for Defendants' original representations, as well as the experiences of other E & B franchise owners, after they closed their doors in December 2006. Had they done so, they would have uncovered the "alarming rate of store failures and closings within the [E & B franchise] system."[51] Instead, Plaintiffs did not even attempt to investigate the situation until Jeff Pullman, another E & B operator, contacted them in 2008.

As discussed above, the discovery rule tolls the limitations period only until the plaintiff has sufficient notice of the facts underlying the claims. A plaintiff need not understand the legal basis for the claim in order for the limitations period to be triggered. Plaintiffs here cannot reasonably argue that they were unaware of the cause of their own harm until Jeff Pullman told them that his E & B franchise also failed. This court finds it equally disingenuous to suggest that Plaintiffs first "learned that they had been harmed by the fraudulent conduct of the Defendants" upon speaking with the lawyer representing them here.[52] This may have been the first time that it occurred to Plaintiffs to file a lawsuit based upon the harm caused by Defendant's conduct, but this cannot be the first notice Plaintiffs had of the harm itself, given that Plaintiffs had sustained $800,000 in losses by the time they closed the store in 2006. Similarly, this cannot be the first

---

[51] Id. at ¶ 4.

[52] See Pl.'s Mem. Opp. Def.'s Mot. Sum. Judg., 13.

notice that Plaintiffs had of the cause of their harm, since their substantial losses stemmed directly from an investment that, but for Defendant Rook's inducements, they would not have made at all.

Having freely agreed to the Master Distribution Agreement, Plaintiffs were bound to abide by the terms therein. The one-year contractual limitations period is no exception. Because Plaintiffs had sufficient notice of the facts underlying their claims more than one year before filing the complaint, Plaintiffs are time-barred from further pursuing this cause of action. Accordingly, Defendants are entitled to summary judgment.

## IV.   Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment [#22] is ALLOWED.

AN ORDER HAS ISSUED.

      /s/ Joseph L. Tauro  
United States District Judge